# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>UBIOME, INC.,[1]<br>　　　　Debtor.<br><br>ALFRED T. GIULIANO, Chapter 7 Trustee,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>JESSICA RICHMAN,<br><br>　　　　Defendant. | Chapter 7<br><br>Case No. 19-11938 (LSS)<br><br><br><br>Adv. Proc. No.: _____ |

**COMPLAINT FOR RECOVERY OF DAMAGES FOR BREACH OF FIDUCIARY DUTY AND BREACH OF WRITTEN CONTRACT**

Except as to his own actions and those matters related to his appointment as Chapter 7 Trustee for the above-captioned Debtor, Plaintiff Alfred T. Giuliano ("Plaintiff") alleges based on information and belief as follows:

**SUMMARY OF THE ACTION**

1.  During 2018, Jessica Richman ("Richman" or "Defendant") and Zachary Apte ("Apte" and, together with Richman, "Richman/Apte") fraudulently raised approximately $60 million for the private company they founded, uBiome, Inc. ("uBiome" or "the company"), a San Francisco medical testing company that Richman told investors was "inventing the microbiome industry" and "making products that improve people's lives." The 2018 "Series C" fundraising

---

[1] The Debtor and the last four digits of its taxpayer identification number is: uBiome, Inc. (0019). The headquarters for the above-captioned Debtor was located at 360 Langton Street, Suite 301, San Francisco, CA 94103.

DOCS_LA:339436.3 31271/001

round led by Richman/Apte valued uBiome at nearly $600 million, and enriched Richman and Apte by millions each through the sale of their own uBiome shares during the round.

2.      To make the securities offering a success, Richman, who was the Chief Executive Officer of uBiome, and Apte, who was its Chief Scientific Officer, painted a false picture of uBiome as a rapidly growing company with a strong track record of reliable revenue through health insurance reimbursements for its tests, one to detect "gut" microorganisms and another for women's health.  Richman/Apte also made numerous misrepresentations that were designed to assure investors that the company's business model and its tests were widely accepted by health insurance companies and downplay any risks to the company's revenue.  Investors invested millions of dollars in uBiome based on Richman/Apte's misrepresentations.

3.      uBiome's purported success in generating revenue, however, was a sham.  It depended on duping doctors into ordering unnecessary tests and other improper practices that Richman and Apte directed and which, once discovered, led insurers to claw back their previous reimbursement payments to uBiome.  Although uBiome employees raised concerns regarding the company's practices, Richman/Apte failed to take action to remedy the improper practices.  They also failed to disclose those practices to investors.  Moreover, Richman/Apte acted to conceal the improper practices from uBiome's general counsel, uBiome's board, and insurers, including directing uBiome employees to provide insurers with backdated and misleading medical records to substantiate the company's prior claims for reimbursement.

4.      Richman/Apte's scheme unraveled in or about April 2019, when the company's Board of Directors initiated an internal investigation, following the FBI's execution of a search warrant at uBiome's San Francisco headquarters.  That investigation brought uBiome's improper

2

billing practices to light and made clear that uBiome's business model was untenable. uBiome then suspended its clinical tests business, and in September 2019 ceased operations and filed for bankruptcy protection. The company is currently undergoing Chapter 7 bankruptcy liquidation.

5.     By her actions, Richman breached her fiduciary duties as an officer and director of uBiome and the terms of her written contract with uBiome (the "Richman Contract"), which breaches have resulted in damages from (i) the destruction of the value that uBiome would have had but for Richman's actions and (ii) the payments of amounts to Richman pursuant to the Richman Contract to which Richman was not entitled by reason of her material breaches of her obligations under the Richman Contract. Plaintiff seeks to recover such damages for the benefit of Debtor's estate.

## JURISDICTION AND VENUE

6.     The Court has jurisdiction over this complaint pursuant to 28 U.S.C. § 157 and § 1334, and venue in this district is proper pursuant to 28 U.S.C. § 1409.

7.     This adversary proceeding is commenced pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The claims set forth herein are not core proceedings under 28 U.S.C. § 157. Pursuant to Local Bankruptcy Rule 7008-1, Plaintiff does not consent to the entry of a final order by the Court in connection with the claims set forth herein to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.     The basis for the relief requested herein is Bankruptcy Rule 7001(1).

**DEFENDANT AND CO-CONSPIRATOR**

9.  Jessica Richman ("Richman" and "Defendant"), age 46, together with co-conspirator Zachary Apte, co-founded uBiome in 2012. At all relevant times, Richman was the Chief Executive Officer and President of uBiome, and a member of uBiome's Board of Directors.

10. Zachary Apte ("Apte" and "Co-Conspirator"), age 36, was, at all relevant times, the Chief Scientific Officer of uBiome and a member of uBiome's Board of Directors. At times, he also used the title of co-CEO of uBiome.

**DEBTOR AND PLAINTIFF**

11. uBiome, Inc. is a Delaware corporation that was based in San Francisco, California and co-founded by Richman and Apte in October 2012. uBiome operated in the biotech field as a medical testing company that developed and sold clinical laboratory tests to individual consumers.

12. On September 4, 2019, uBiome filed for Chapter 11 bankruptcy protection in U.S. Bankruptcy Court for the District of Delaware. On October 11, 2019, the Court entered an order converting this Case to chapter 7 [Docket No. 162] and Plaintiff was appointed as the chapter 7 trustee [Docket No. 163].

**FACTUAL ALLEGATIONS**

I. **uBiome and its Business Model**

13. Richman/Apte co-founded uBiome in October 2012. uBiome developed and performed proprietary laboratory tests that purportedly identified microorganisms in the gut and

4

genitals and assisted in the diagnosis of conditions such as inflammatory bowel disease and sexually transmitted infections.

14.     At all relevant times, Richman/Apte closely monitored and managed every aspect of uBiome's operations together.  Richman focused on the company's growth and financing, and Apte concentrated on the technology and science.  However, Richman/Apte addressed most issues together and no decision about a significant aspect of uBiome's business was made without the knowledge and approval of at least one of Richman or Apte.  Richman/Apte also had a romantic relationship and ultimately married in 2019.

**II. Richman/Apte Engaged in a Scheme to Inflate the Company's Revenue Through Improper Insurance Billing Practices**

15.     Beginning in or about late 2015, uBiome, at Richman/Apte's direction, turned its focus to developing and marketing tests that could be billed to insurance companies, which generally required an order or prescription from a healthcare provider.

16.     Richman/Apte decided to pivot uBiome's business model to clinical tests-that is, those ordered by doctors rather than consumers-so that uBiome would be able to charge insurers significantly more money for the tests than it charged consumers.  Those higher billings would in turn allow uBiome to dramatically accelerate its revenue growth in advance of the company's anticipated fundraising rounds and eventual initial public offering.

17.     In accordance with this plan, on November 1, 2016, uBiome issued a press release announcing the launch of its first clinical test, SmartGut.  The press release described SmartGut as "the world's first sequencing-based clinical microbiome screening test" and touted that "SmartGut is covered by US health insurance for the majority of patients."  A year later, on

5

November 14, 2017, uBiome announced the launch of a second clinical test, SmartJane, which the company's press release described as "the first sequencing-based at-home women's health test" and "Covered by Health Insurance."

18.     Soon thereafter, Richman/Apte, eager to demonstrate strong growth and revenue to investors in the lead up to the company's Series C fundraising round, set an internal goal of 10 percent month-over-month growth in uBiome's insurance billing volume. But to meet the goal, Richman/Apte faced considerable challenges in satisfying health insurer requirements to reimburse the company's tests at the rate they desired.

19.     Indeed, Richman/Apte were aware, based on several warnings from company employees and uBiome's general counsel, that the company needed to meet certain health insurance company requirements before the company's tests could be approved for reimbursement. Richman/Apte ignored these warnings and adopted and approved several improper billing practices that they knew, or were reckless in not knowing, fell below insurer requirements and thus, once discovered, would prompt insurers to reject reimbursement claims for uBiome's clinical tests. Richman/Apte engaged in deceptive acts to conceal facts pertinent to uBiome's practices from the company's general counsel, the uBiome board, prescribing doctors, and insurers.

20.     As one example, Richman/Apte oversaw the design and operation of a website portal that uBiome used to connect doctors to consumers for purposes of ordering tests (the "doctor network"). This network was essential to uBiome's insurer reimbursement-based business model, and for satisfying insurer requirements that a laboratory test be prescribed by a doctor who had formed a sufficient relationship with a patient prior to ordering tests that would

6

be covered by insurance. Yet, as Richman/Apte knew, or were reckless in not knowing, the doctor network fell below insurer requirements in two aspects.

21.     First, as Richman/Apte knew, the doctor network was designed to steer doctors toward ordering SmartGut or SmartJane tests without establishing the required doctor-patient relationship.  In particular, Richman/Apte understood that the default for doctors was to approve test requests based solely on online questionnaire responses that consumers submitted through uBiome's website, without any pre-existing relationship, live consultation, or further interaction between the doctor and consumer.  However, in July 2017, shortly after uBiome launched its doctor network, the company's general counsel emailed Richman/Apte warning them that any tests prescribed based solely on consumers' questionnaires, versus a live consultation between consumer and doctor, would be a reimbursement risk.  Nevertheless, Richman/Apte continued uBiome's use of the questionnaire-based doctor network and concealed this fact from the general counsel and the uBiome board.

22.     Second, Richman/Apte used the doctor network to dupe doctors into ordering many tests of dubious clinical utility.  These tests were retests of consumers' old samples, and in 2017, uBiome's then-laboratory director warned Richman/Apte that such retests lacked "current clinical relevance" and could be fraudulent.  Despite this warning, Richman/Apte directed uBiome to broadly advertise the retests to consumers.  Richman/Apte also acted to deceive doctors by making the consumers' resulting retest requests appear to be requests for tests on new samples.  For example, at Richman/Apte's direction, uBiome resubmitted consumers' originally reported symptoms to the doctors reviewing retest requests as if they were newly reported symptoms.  Also, at Apte's direction, written test results from the original tests of the samples

7

were withheld from doctors. Richman/Apte then directed the company to bill insurance companies for these retests in order to create the appearance of steady growth from at least late 2017 through 2018.

23. Richman/Apte engaged in additional deceptive acts to mislead insurers about the doctor network. By May 2018, the start of uBiome's Series C offering, Richman/Apte learned that certain insurance companies had asked uBiome to submit supporting medical records reflecting that doctors had contemporaneously consulted with patients for the billed tests. Because the records did not exist, however, Richman/Apte directed company employees to create and backdate records to make it seem as though doctor-patient consultations had occurred, and then to submit those fake records to insurance companies.

24. Richman/Apte's billing scheme extended to other areas. For instance, Richman/Apte had uBiome bill for some tests that had not yet been performed and might never be performed because the version of the test to be used had not been proven to work. Richman/Apte also ignored insurance rules that required clinical lab providers to collect from consumers applicable co-pays, coinsurance, and deductibles, collectively known as "patient responsibility." In addition, Richman/Apte misused and manipulated the billing codes that are a key component of insurers' review of reimbursement claims. Indeed, Richman/Apte directed the company to use incorrect insurance billing codes and/or vary the codes when billing for the same type of test to avoid claims rejection, even though there was no legitimate basis for doing so. Richman/Apte engaged in these practices despite warnings from company employees, including warnings in August 2018 during the Series C offering.

25.     Ultimately, Richman/Apte's billing schemes enabled uBiome to access the lucrative health insurance reimbursements on which the company relied to create the appearance of rapid increases in revenue growth.  Indeed, according to financial information that Richman provided to the lead investor in the Series C round, uBiome generated nearly 91 percent of its revenue from health insurance reimbursements by the first quarter of 2018.  That same financial information showed that the company projected billing for its clinical tests to increase to approximately 97 percent of its total revenue by 2020.

### III.     Richman/Apte Misled Investors in uBiome's Series C Offering

#### A.     uBiome's Series C Offering

26.     Based on the company's false appearance of revenue growth, Richman/Apte actively promoted the Series C offering from approximately May 2018 through September 2018. They did so despite being aware of the significant risks to their business model, including that several insurers had challenged uBiome's practices in writing before and during the offering, and despite employee warnings of insurance fraud during the offering.  The offering, which valued uBiome at nearly $600 million, succeeded in raising approximately $59 million through the offer and sale of shares of uBiome's preferred stock to approximately 27 investors.

27.     In addition to purchasing preferred stock in the Series C offering, approximately six investors purchased uBiome convertible promissory notes during the same period for a total of more than $2 million.  The notes, which were prominently labeled as "securities" on their face, had terms of approximately 360 days and were convertible into uBiome stock.  The investors who purchased the convertible promissory notes represented that they were acquiring the notes "for investment."

28. As part of the Series C offering, Richman sold uBiome stock she personally owned for approximately $5 million. Apte also sold uBiome stock he personally owned for approximately $5 million.

29. Richman/Apte led uBiome's Series C offering and actively promoted the company to prospective investors. Defendants personally met and communicated with prospective investors as part of the company's fundraising efforts, including through participation in due diligence calls.

30. Richman/Apte also provided prospective investors with documents in connection with the Series C offering, including pitch decks, financial information, and other promotional materials. Richman was the primary drafter of the pitch decks provided to investors.

### B. Richman/Apte Made Material Misrepresentation to Investors Regarding uBiome's Business Model and Ability to Generate Revenue

31. In their communications with investors during the offering, Richman/Apte consistently painted the false picture of uBiome as a company with an established business model that had been proven to generate revenue through collections from healthcare insurers and could be expected to continue to generate such revenue at a rapidly increasing rate.

32. Richman/Apte repeatedly described uBiome's clinical tests to investors as "ordered by doctors, reimbursed by insurance." That description of uBiome's clinical test business was made in various pitch decks provided by Richman/Apte to prospective investors between May and September 2018, during the company's Series C offering.

DOCS_LA:339436.3 31271/001

33. Richman/Apte's representation of uBiome's clinical tests as "ordered by doctors, reimbursed by insurance" gave the false and misleading impression that the tests fit squarely within the well-established and lucrative healthcare insurance reimbursement model.

34. Although uBiome clinical tests were "ordered by doctors," those doctors, by Richman/Apte's own design, often did not know what they were ordering. As described above, Richman/Apte acted to conceal from doctors the fact that the tests they were ordering were, in many cases, actually retests of old samples with no clear clinical utility.

35. Richman/Apte's representation of uBiome's business as one based on "reimbursement by insurance," was also false and misleading. In truth, Richman/Apte knew, or were reckless in not knowing, that uBiome was engaged in numerous improper billing practices, as described above, that would lead insurers to deny reimbursement for tests uBiome billed, once insurers caught on to the practices. Indeed, before the end of the Series C offering, Richman/Apte knew that multiple insurers had challenged the company's practices, with one alleging that uBiome was engaged in "fraud and abuse."

36. Richman/Apte also misled investors by touting fantastic revenue growth while, at the same time, concealing from investors that uBiome's revenue depended on keeping insurers in the dark about the company's improper billing practices. For instance, on June 29, 2018, Apte emailed the lead Series C investor, copying Richman, stating that uBiome "billed 15,351 samples in April, with an annualized revenue run rate of $109.2 million," increasing to "16,985 samples in May, with an annualized revenue run rate of $121.2 million." Apte represented that uBiome had "3.4x the billable samples and revenue" it had in November 2017, and that the company

"recognize[d] revenue of $594 per sample based on what we reasonably expect to collect on the lifetime of a sample."

37. Similarly, in an email that Richman sent widely to solicit Series C investors in July 2018, she wrote, copying Apte, that uBiome had achieved "[r]evenue growth of almost 900% since June 2017" and would earn "[o]ver $100 million total revenue for 2018."

38. Richman/Apte knew, or were reckless in not knowing, that the revenue numbers and projections they provided investors were false and misleading because (i) they were achieved using billing practices that Richman/Apte knew, or were reckless in not knowing, were improper and that insurers had begun flagging and rejecting, and (ii) a significant percentage of uBiome's sales volume and revenue as represented to investors depended on billing for retests of old samples with no clear clinical utility. Indeed, at no point during the Series C round did Richman/Apte disclose to investors the insurer challenges to uBiome's billing practices that the company had received.

39. Richman/Apte also falsely represented to investors that uBiome's clinical tests were covered by "existing [insurance billing] codes" and "current health plan guidelines." These misrepresentations were included in pitch decks that Richman and Apte each provided to investors during the Series C round. The lead investor found these representations to be important because they signified that uBiome could "quickly and efficiently" launch its clinical tests, thereby avoiding a years-long process for applying for a new, custom insurance billing code. In reality, however, Richman/Apte knew, or were reckless in not knowing, that uBiome was relying on incorrect billing codes and varying billing codes by insurer to trick insurers into

12

reimbursing the company.  In August 2018, Richman/Apte were warned by a company employee that these practices were potentially fraudulent.

40. Richman/Apte made additional, specific representations reassuring the lead investor of the Series C round that several aspects of the company's business model were valid. For instance, Richman/Apte claimed that the company's doctor network exceeded regulatory standards and had been vetted by uBiome's counsel.  Yet, as described above, counsel in fact had warned Richman/Apte about the risk that insurers would reject the network uBiome used.

41. Richman/Apte's misrepresentations and other deceptive conduct regarding uBiome's business model and ability to generate revenue were important to investors because they were directly related to the viability of uBiome's business and, therefore, the likelihood that investors would obtain a return on their investments in the company.

### IV. Richman/Apte Fraud Unraveled when uBiome's Business and Billing Practices Came to Light

42. During the Series C offering, Richman/Apte knew that uBiome had received challenges to the company's practices from multiple insurers, with one alleging that the company was engaged in "fraud and abuse."  Nevertheless, Richman/Apte did not disclose any of these challenges to other members of uBiome's Board of Directors until December 2018, and even then, Richman falsely represented that the company had only received one such challenge. Ultimately, by April 2019, uBiome had received letters and written communications from at least 18 insurers challenging the company's business and billing practices with several seeking clawback payments.

43. In or about April 2019, uBiome's Board of Directors initiated an internal investigation of the company's practices, following the FBI's execution of a search warrant at uBiome's San Francisco headquarters. Approximately two months after the internal investigation was initiated, Richman/Apte were both fired.

44. In September 2019, uBiome ceased operations and filed for bankruptcy protection because it did not have a sustainable model for generating revenue. The company is currently undergoing Chapter 7 bankruptcy liquidation.

## FIRST CLAIM FOR RELIEF

### (Breaches of Fiduciary Duty against Richman)

45. Plaintiff realleges and incorporates by reference paragraphs 1 through 44.

46. Richman, by engaging in the conduct described above, breached her fiduciary duties as an officer and director of uBiome, not only unjustly enriching herself but also causing the complete destruction of the value that uBiome would have had but for Richman's actions.

47. As a direct proximate result of Richman's above-described breaches of her fiduciary duties, Debtor suffered damages in an amount in excess of $10,000,000 and Richman was unjustly enriched in an amount in excess of $5,000,000, the exact amounts to be established at trial.

## SECOND CLAIM FOR RELIEF

### (Breaches of Written Contract against Richman)

48. Plaintiff realleges and incorporates by reference paragraphs 1 through 44.

49. On or about April 30, 2014, Richman and uBiome entered into a written employment agreement (the "Richman Contract") pursuant to which uBiome confirmed

14

Richman as uBiome's Chief Executive Officer and Richman agreed that she would not engage in any illegal or gross misconduct that would be materially and demonstrably injurious to uBiome.

50. UBiome fulfilled all of its obligations to Richman under the terms of the Richman Contract.

51. Richman, by engaging in the conduct described above, breached her obligations to uBiome under the Richman Contract.

52. As a direct, proximate result of Richman's above-described breaches of her obligations to uBiome under the Richman Contract, Debtor suffered damages in an amount in excess of $10,000,000 and is entitled to the return of all compensation paid to Richman under the terms of the Richman Contract after the earliest of such breaches in an amount in excess of $300,000, the exact amounts to be established at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be rendered in Plaintiff's favor and against Richman as follows:

1. On the First Claim for Relief, for an award of Plaintiff's actual damages against Richman according to proof at trial in an amount of not less than $15,000,000;

2. On the Second Cause of Action, for an award of Plaintiff's actual damages against Richman according to proof at trial in an amount of not less than $10,300,000;

3. On both causes of action, for an award of its costs and expenses as allowed by law, and

4. On both causes of action, for such other and further relief as the Court deems just and proper.

| | |
|---|---|
| Dated: September 2, 2021 | PACHULSKI STANG ZIEHL & JONES LLP |
| | |
| | */s/ Bradford J. Sandler* |
| | Bradford J. Sandler (DE Bar No. 4142) |
| | James K. T. Hunter (Pro Hac Vice) |
| | Colin R. Robinson (DE Bar No. 5524) |
| | Peter J. Keane (DE Bar No. 5503) |
| | PACHULSKI STANG ZIEHL & JONES LLP |
| | 919 N. Market Street, 17th Floor |
| | Wilmington, DE 19801 |
| | Telephone:  (302) 652-41000 |
| | Facsimile:   (302) 652-4400 |
| | E-mail: bsandler@pszjlaw.com |
| | jhunter@pszjlaw.com |
| | crobinson@pszjlaw.com |
| | pkeane@pszjlaw.com |
| | |
| | Attorneys for Plaintiff Alfred T. Giuliano, Chapter 7 Trustee |